UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COURTNEY M. JUDD, )  )  Plaintiff, )  )  vs. )  )  CAROLYN W. COLVIN Acting )  Commissioner of the Social Security )  Administration, )  )  Defendant. ) | No. 1:16-cv-00579-JMS-DKL |

## ORDER

Plaintiff Courtney Judd applied for disability benefits under the Social Security Act on March 15, 2013. [Filing No. 14-2 at 17.] Her claim was denied both initially and on reconsideration, and a hearing was held before Administrative Law Judge ("ALJ") Ronald T. Jordan on January 13, 2015. [Filing No. 14-2 at 17.] On January 23, 2015, the ALJ issued an opinion concluding that Ms. Judd was not disabled as defined by the Social Security Act. [Filing No. 14-2 at 17.] The Appeals Council denied her request for review on February 17, 2016, making the ALJ's decision the Commissioner's final decision subject to judicial review. [Filing No. 14-2 at 2.] Ms. Judd filed this civil action pursuant to 42 U.S.C. § 405(g) on November 20, 2015, asking this Court to review her denial of benefits. [Filing No. 1.]

## I.
### STANDARD OF REVIEW

"The Social Security Act authorizes payment of disability insurance benefits and Supplemental Security Income to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second it requires

1

an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last . . . not less than 12 months." *Id.* at 217.

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must afford the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform [her] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in original). "If a claimant satisfies steps one, two, and three, [she] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [she] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

2

After Step Three, but before Step Four, the ALJ must determine a claimant's Residual Functional Capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work, and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 416.920(e), (g). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (citation omitted).

## II.
### RELEVANT BACKGROUND

Ms. Judd was born in 1989. [Filing No. 14-2 at 27.] After being initially tested in elementary school, Ms. Judd was diagnosed as mildly mentally handicapped. [Filing No. 14-6 at 70.] As a result, she attended special education classes through high school and obtained a certificate of completion. [Filing No. 14-2 at 46.]

In February of 2010, Ms. Judd was evaluated by Dr. Albert Fink. [Filing No. 14-7 at 3.] Dr. Fink administered the Wechsler Adult Intelligence Scale (Fourth Edition) ("WAIS-IV") test and assessed a full scale IQ of 65, a score in the first percentile. [Filing No. 14-7 at 4.] Dr. Fink observed that Ms. Judd "did not appear to concentrate well during formal testing suggesting that

3

the results obtained may well be an under estimate of actual ability." [Filing No. 14-7 at 3.] Dr. Fink diagnosed Ms. Judd with borderline intellectual functioning and a reading disorder (by history). [Filing No. 14-7 at 5.] In October of 2010, Ms. Judd was evaluated by Dr. Betty Unger Watson. [Filing No. 14-7 at 38.] Dr. Watson diagnosed Ms. Judd with "possible mild mental retardation or borderline intellectual functioning." [Filing No. 14-7 at 41.] Also in October 2010, Ms. Judd was evaluated by Dr. Deborah Zera. [Filing No. 14-7 at 43.] Dr. Zera diagnosed Ms. Judd with "mild mental retardation," ruling out borderline intellectual functioning and learning disabilities. [Filing No. 14-7 at 44.] Neither Dr. Watson nor Dr. Zera administered an IQ test.

In December of 2010, Ms. Judd was evaluated by Dr. Eileen Schellhammer, a licensed school psychologist. [Filing No. 14-9 at 15.] Dr. Schellhammer evaluated Ms. Judd using the Stanford Binet Intelligence Scale (Fifth Edition) and assessed a full scale IQ of 57. [Filing No. 14-9 at 19.] On the Wide Range Achievement Test IV ("WRAT-IV"), Ms. Judd "showed basic skills at the late second to mid-third grade equivalence," with a reading level assessed at grade 2.9. [Filing No. 14-9 at 19.] In April of 2013, Ms. Judd was again evaluated by Dr. Fink. [Filing No. 14-7 at 65.] He diagnosed Ms. Judd with a reading disorder and borderline intellectual functioning. [Filing No. 14-7 at 66.] Dr. Fink did not administer an IQ test.

Ms. Judd has not been able to obtain a driver's license, which she testified was because she could not pass the written examination portion of the test. [Filing No. 14-2 at 44.] She was previously employed at a daycare and as a cafeteria worker. [Filing No. 14-2 at 45-46.]

Using the five-step sequential evaluation set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4), the ALJ ultimately concluded that Ms. Judd is not disabled. [Filing No. 14-2 at 28.] The ALJ found as follows:

4

- At Step One of the analysis, the ALJ found that Ms. Judd meets the insured status requirements of the Social Security Act through September 30, 2015, and has not engaged in substantial gainful activity[1] since her alleged onset date of October 1, 2005. [Filing No. 14-2 at 19.]

- At Step Two of the analysis, the ALJ found that Ms. Judd has the following severe impairments: mental handicap. [Filing No. 14-2 at 19.]

- At Step Three of the analysis, the ALJ found that Ms. Judd does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. [Filing No. 14-2 at 19.] The ALJ considered various listings, but ultimately found that Ms. Judd does not meet any of them. [Filing No. 14-2 at 20-23.]

- After Step Three but before Step Four, the ALJ found that Ms. Judd has the RFC to do as follows:

    perform a full range of work at all exertional levels but with the following nonexertional limitations: the work must require only simple, repetitive tasks requiring no independent judgment regarding basic work processes. Work goals from day to day should be static and predictable. The work must not require a production pace.

    [Filing No. 14-2 at 23.]

- At Step Four of the analysis, the ALJ concluded that Ms. Judd had no past relevant work. [Filing No. 14-2 at 27.]

---

[1] Substantial gainful activity is defined as work activity that is both substantial (i.e. involves significant physical or mental activities) and gainful (i.e. work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a); 20 C.F.R. § 416.972(a).

- At Step Five, the ALJ found that jobs exist in significant numbers in the national economy that Ms. Judd could perform, specifically: housekeeper; auto detailer; and warehouse worker. [Filing No. 14-2 at 27-28.]

- Based on these findings, the ALJ concluded that Ms. Judd is not disabled as defined by the Social Security Act and, thus, is not entitled to the requested disability benefits. [Filing No. 14-2 at 28.]

## III.
### DISCUSSION

Ms. Judd presents multiple issues on appeal that she contends require this Court to reverse the decision of the ALJ denying her request for disability benefits. [Filing No. 18.] First, she contends the ALJ erred at Step Three by concluding that she did not meet Listing 12.05(C). [Filing No. 18 at 4.] Second, she claims that the ALJ erred by failing to evaluate material medical evidence in the record, specifically her four Global Assessment of Functioning ("GAF") scores. [Filing No. 18 at 4.] And third, Ms. Judd argues that the ALJ made an erroneous credibility determination.[2] [Filing No. 18 at 4.] After evaluating the parties' arguments, the Court reverse the ALJ's decision denying disability benefits to Ms. Judd.

**A. Listing 12.05 (Intellectual Disability)**

Ms. Judd argues that the ALJ erred in concluding that she did not meet Listing 12.05(C). [Filing No. 18 at 17.] She contends that the ALJ erroneously found that there was no evidence in the record establishing that she suffers from an additional impairment (beyond her intellectual disability) that causes a significant work-related limitation. [Filing No. 18 at 22.] She also argues

---

[2] Ms. Judd initially raised an additional claim that the ALJ erred in determining her RFC because he omitted Ms. Judd's moderate restrictions with concentration, persistence, or pace. [Filing No. 18 at 39.] In her reply brief, Ms. Judd withdrew that claim, so the Court will not address it here. [*See* Filing No. 25 at 1.]

that the ALJ failed to explain why he concluded that Ms. Judd did not have a valid IQ score between 60 and 70. [Filing No. 18 at 18.]

The Commissioner argues in response that the ALJ correctly concluded that Ms. Judd does not suffer from an additional impairment that imposes a significant work-related limitation. [Filing No. 24 at 12.] The Commissioner also responds that the ALJ did conclude that Ms. Judd had a valid IQ score of between 60 and 70. [Filing No. 24 at 12.]

A listing "describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (citing 20 C.F.R. § 404.1525(a)). The Code of Federal Regulations provides that the Social Security Administration "will find that [a claimant's] impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement...." 20 C.F.R. § 416.925(c)(3). Listing 12.05 contains an initial paragraph that lays out the diagnostic description of intellectual disability, plus four separate criteria (paragraphs A through D). *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00. In order to meet Listing 12.05, a claimant must have an impairment that meets one of the four criteria of that Listing. *See Adkins v. Astrue*, 226 Fed. Appx. 600, 605 (7th Cir. 2007) (citing 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05); *Maggard*, 167 F.3d at 380.

The Seventh Circuit has summarized the requirements for a finding of intellectual disability under Listing 12.05(C) as follows: "(1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning initially manifested during the developmental period before age 22; (3) a valid verbal, performance, or full scale IQ of sixty through seventy; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Adkins*, 226 Fed. Appx. at 605 (citations omitted); *see also* 20 C.F.R. Pt. 404, Subpt.

P, App. 1 at § 12.00(A) ("If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing."). The Seventh Circuit has also noted that "[o]rdinarily a person with an IQ under 70 and at least one additional impairment that imposes a limitation on ability to work…is automatically deemed to be disabled." *Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014).

        1. *Additional Impairment*

Regarding Listing 12.05(C), the ALJ concluded that

> [f]inally, the 'paragraph C' criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing any additional and significant work-related limitations of function. In fact, there is no evidence of any other significant physical or mental impairment. Although Dr. Fink diagnosed a reading disorder, by history, there is no current evidence of such a disorder. Any deficits she has in reading very likely are attributable to her mental handicap and impose no additional and significant work-related limitation.

[Filing No. 14-2 at 23.] Ms. Judd argues that the ALJ erred in concluding that there was no evidence in the record establishing that she suffers from an additional impairment (beyond her intellectual disability) that causes a significant work-related limitation. [Filing No. 18 at 39.] Ms. Judd contends that the ALJ also erred in concluding that her reading and learning disabilities were "likely [ ] attributable to her mental handicap," and therefore did not qualify as separate impairments.[3] [Filing No. 18 at 39.] The Commissioner responds that the ALJ correctly determined that Ms. Judd did not suffer from an additional impairment, but that even if she did, that impairment did not impose any additional and significant work-related limitations. [Filing No. 24 at 25.]

---

[3] The first requirement, that Ms. Judd have a valid full scale IQ score between 60 and 70, will be addressed in the following section.

The ALJ erred in concluding that there was no evidence of an additional mental impairment, and in concluding that her reading disorder was "likely attributable" to her mental handicap. The ALJ cited no medical or psychological evidence to support his conclusion that Ms. Judd's reading disability was "very likely…attributable" to her mental handicap. [Filing No. 14-2 at 23.] Nothing in the evaluations by the various examiners suggests that any of Ms. Judd's disabilities would be attributable to one another. The consultative examiners who evaluated Ms. Judd addressed her various potential intellectual disabilities separately, including borderline intellectual functioning, mild mental retardation, learning disability, and reading disability. [*See* Filing No. 14-7 at 2-6; Filing No. 14-7 at 43-44; Filing No. 14-7 at 65-67; Filing No. 14-9 at 15-26.]

For example, Dr. Fink, in his second and most recent evaluation, diagnosed Ms. Judd with borderline intellectual functioning *and* a reading disorder. [Filing No. 14-7 at 66.] Dr. Zera diagnosed Ms. Judd with mild mental retardation, and indicated that a rule-out diagnosis was necessary for borderline intellectual functioning and learning disabilities. [Filing No. 14-7 at 44.] While it may seem intuitive to the ALJ that a reading disability would be somehow linked to mild mental retardation, the ALJ may not rely on his own intuition. It is well-established that "[l]ay intuitions about medical phenomena are often wrong." *Id.* The ALJ cannot "succumb to the temptation to play doctor." *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990). Moreover, the ALJ cited no legal authority suggesting that a reading or learning disability (whether or not "attributable to a mental handicap") would not be considered an additional impairment under Listing 12.05(C). *See Lugo v. Barnhart,* 2003 WL 22025011, at *9 (N.D. Ind. 2003) ("this Court acknowledges that a learning disorder in addition to mental retardation could satisfy § 12.05(C)"). This was error that requires remand.

The Commissioner responds that any error was harmless, because either (1) there is no record evidence establishing that Ms. Judd still suffers from a reading disability; or (2) she failed to establish that any such disability was significant enough to impose a work-related limitation. [Filing No. 24 at 13-16.] The Commissioner's first argument is unavailing. Dr. Fink's 2013 report indicated a diagnosis of "reading disorder." [Filing No. 14-7 at 66.] That diagnosis is supported by prior reports, including Dr. Fink's earlier diagnosis of reading disorder by history, [Filing No. 14-7 at 5], and Dr. Schellhammer's grade 2.9 reading level assessment, [Filing No. 14-9 at 26].

The Commissioner's second argument is also unpersuasive. It is correct that Ms. Judd bears the burden of proving that her additional disability imposes a significant, work-related restriction. However, because the ALJ concluded that Ms. Judd presented "no evidence" of an additional restriction, he did not provide any analysis as to how significant such an impairment might be.

### 2. Full Scale IQ Between 60 and 70

Ms. Judd argues that the ALJ erred in concluding that she did not have a valid full scale IQ score between 60 and 70. The Commissioner responds that the ALJ made no such finding.

The ALJ stated, "[f]inally, the 'paragraph C' criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing any additional and significant work-related limitations of function." [Filing No. 14-2 at 23.] Ms. Judd interprets this statement as concluding that she satisfied *neither* the IQ *nor* the "other mental impairment" criterion. The Commissioner interprets this statement differently, arguing that the ALJ concluded that Ms. Judd *does* have a valid IQ score between 60 and 70, but *does not* meet the requirement of an additional impairment.

The ALJ's statement is ambiguous. Given the conjunctive construction of the sentence, it is not clear whether the ALJ concluded that Ms. Judd failed to meet both, or just one, of the subsection's requirements. And the ALJ does not expressly state anywhere in his decision whether Ms. Judd has a valid IQ score between 60 and 70. In December of 2010, Dr. Schellhammer assessed a full scale IQ score of 57. That score, if credited by the ALJ, would have satisfied paragraph 12.05(B), which requires "a valid verbal, performance, or full scale IQ of 59 or less." *See* [20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05]. But the ALJ found the score of 57 invalid, concluding that Ms. Judd "does not have a valid verbal, performance, or full scale IQ of 59 or less." [[Filing No. 14-2 at 23].] The ALJ did not state explicitly why he found the score of 57 invalid, but he did state that "testing in December 2010 showed a Full Scale IQ of 57, yet testing earlier that year showed a Full Scale IQ score of 65 along with apparent minimal effort, suggesting a higher potential." [[Filing No. 14-2 at 23] (internal citations omitted).] It is possible that the ALJ found the score of 57 invalid, and the score of 65 valid, but it is not clear based on the language of the decision.

The Court agrees with the Commissioner that the context of the ALJ's statement suggests that the ALJ likely concluded or assumed that the IQ score of 65 was valid, and then found that Ms. Judd did not suffer from another impairment. Taking the ALJ's first sentence together with subsequent ones, the decision reads as follows:

> [f]inally, the 'paragraph C' criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. In fact, there is no evidence of any other significant physical or mental impairment.

[Filing No. 14-2 at 23.] However, the fact remains that the ALJ's decision was silent as to his finding on valid IQ scores. On remand, the ALJ should make an explicit finding as to the valid IQ score, in order to remedy the ambiguity that exists in the current decision.

### B. GAF Scores

Ms. Judd argues that the ALJ failed to properly evaluate the GAF scores in the record. [Filing No. 18 at 39.] A GAF score of 41 to 50 indicates "serious symptoms or [a] serious impairment in social, occupational, or school functioning," and Ms. Judd argues that two of her GAF scores (45 and 50) indicate an inability to maintain employment. [Filing No. 18 at 39.] The Commissioner disagrees, arguing that no further discussion of the GAF scores was required. [Filing No. 18 at 39.]

The ALJ recounted at some length the four evaluations that contained GAF assessments. At the end of each of those discussions, the ALJ stated the GAF score that was reported by each individual reviewer, which ranged from 45 to 60. [Filing No. 14-2 at 23-24.] That constituted the entirety of the ALJ's GAF treatment.

An ALJ must consider all evidence in the record and may not ignore an entire line of evidence contrary to his decision. *See Sparks v. Colvin*, 2015 WL 3618344, at *6-7 (S.D. Ind. 2015). But, an ALJ is not required to give any weight to individual GAF scores, *see Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010), and a low GAF score alone is insufficient to overturn an ALJ's finding of no disability, *Bates v. Colvin,* 736 F.3d 1093, 1100 (7th Cir. 2013).

Here, the ALJ did not ignore Ms. Judd's GAF scores. First, the ALJ expressly listed all of Ms. Judd's scores, so he was clearly aware that Ms. Judd had received assessments indicative of potentially serious symptoms. [Filing No. 14-2 at 23-24.] He then considered the broader record of Ms. Judd's intellectual impairments, including the evaluations upon which the GAF scores were

based, Ms. Judd's testimony, and the third-party report submitted by Ms. Judd's mother. The ALJ "need not evaluate in writing every piece of testimony and evidence submitted," *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), and the ALJ's decision makes clear that he considered the record medical evidence upon which the GAF scores were based. Therefore, remand is not required on this issue.

### C. Credibility Determination

Ms. Judd also argues that the ALJ's credibility determination was patently wrong. The Commissioner disagrees. The ALJ concluded that he "generally [found] the claimant's description of the location, duration, frequency, and duration of her symptoms unpersuasive as they are generally unfounded elsewhere in the record." [Filing No. 14-2 at 26.] The ALJ stated, among other credibility findings, that:

> [s]he has alleged that she cannot read, yet at the hearing she admitted that she can read some and that she received good grades in reading and English. Although these were special education classes, it is highly unlikely that she would have received such grades if she had no reading ability.

[Filing No. 14-2 at 26.]

Because the case is being remanded on other issues, the Court need not fully address Ms. Judd's credibility argument. But the Court notes that it is concerned by the ALJ's conclusion regarding Ms. Judd's reading ability. First, the ALJ does not specify where in the record Ms. Judd alleges that she "cannot read." The following exchange took place at Ms. Judd's hearing:

> **ALJ**: I mean, I was kind of, struck by the fact that you got an A in reading one year. And A's and B's in English. I guess you were in special ed.
>
> **Ms. Judd**: Yeah. I was in special ed classes.
>
> **ALJ**: But you say you can't read?
>
> **Ms. Judd**: Big words. Like, because I was in special ed, I can't do, like regular classes. I was in all special ed classes.

13

>**ALJ**: Right. Right.
>
>**Ms. Judd**: And easy level reading. And then, they try to make it harder, and I couldn't do that. I had to, like, do easy levels when I was in high school.
>
>**ALJ**: Okay. So, you can read.
>
>**Ms. Judd**: Yeah, a little bit.

[Filing No. 14-2 at 39.] Elsewhere in his decision, the ALJ writes that Ms. Judd "said she does not drive because she cannot read to pass the test." [Filing No. 14-2 at 20.] It appears that the ALJ drew this statement from Dr. Fink's first report, in which Dr. Fink writes, "[s]he does not have a driver's license indicating that she has never been able to pass the test 'because [she] could not read.'" [Filing No. 14-7 at 5.]

A review of the complete record suggests that Ms. Judd's statements regarding her reading ability amount to her expressing that she could not read *well*, not that she could not read at all. Indeed, it would have been strange for Ms. Judd to have told Dr. Fink (or any other evaluator) that she could not read at all, given that all of her evaluators administered tests to her that required reading. She also stated to evaluators and testified at her hearing that she could not read well.

It is unclear what evidence the ALJ relied upon in making his credibility assessment on this issue, but it seems implausible that Ms. Judd attempted to convince others that she was completely illiterate. On remand, the ALJ should ensure that he builds a logical bridge between the evidence on which he relies and his credibility determination.

### IV.
#### CONCLUSION

For the reasons detailed herein, the Court **VACATES** the ALJ's decision denying Ms. Judd benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four). Final judgment will issue accordingly.

Date: 12/29/2016

_[signature]_

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Electronic Distribution via CM/ECF:**

Timothy J. Vrana
TIMOTHY J. VRANA LLC
tim@timvrana.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov